J-S28044-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: K.E.S., M.D.S. & J.L.J., MINORS | : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: T.S. | : | No. 126 MDA 2019 |

Appeal from the Orders Entered December 19, 2018
in the Court of Common Pleas of Snyder County
Civil Division at No(s):  OC-14-18,
OC-15-18, OC-16-18

BEFORE:   BOWES, J., McLAUGHLIN, J. and STRASSBURGER, J.*

MEMORANDUM BY STRASSBURGER, J.:   **FILED: AUGUST 19, 2019**

T.S. (Father) appeals from the orders entered December 19, 2018, in the Court of Common Pleas of Snyder County, which terminated involuntarily his parental rights to his children, J.L.J., a male born in June 2008, M.D.S., a female born in October 2012, and K.E.S., a female born in November 2013 (collectively, Children).[1]  We affirm.

We summarize the facts and procedural history of this matter as follows. J.L.J. was born after Father committed a statutory sexual assault of Mother.[2]

_____

* Retired Senior Judge assigned to the Superior Court.

[1] The orders also terminated the parental rights of A.J. (Mother).  Mother did not appeal the termination orders, but she filed a brief in support of Father's position in Father's appeal.

[2] Father was 30 years old and Mother was 15.  **See** 18 Pa.C.S. § 3122.1 (prohibiting person from engaging in sexual intercourse with a complainant

N.T., 12/14/2018, at 49-50. Father was convicted and incarcerated from March 2009 until February 2010.[3] *Id.* at 84. J.L.J. was nine months old when Father went to prison. After Father's release, he and Mother engaged in a relationship, resulting in M.D.S.'s birth. *Id.* at 51, 80. Around approximately the same time, Father committed a probation violation by failing to report an address change. *Id.* at 80. He was incarcerated from June 2012 until October 2012. *Id.* at 85. He resumed his relationship with Mother after his release, and K.E.S. was born the following year. *Id.* at 88-89.

At the time of Father's conviction for statutory sexual assault in 2009, he was not required to register as a sexual offender. *Id.* at 84. However, Father was required to register retroactively following the implementation of Pennsylvania's Sex Offender Registration and Notification Act (SORNA)[4] in 2012. *Id.* In July 2014, Father was convicted of failing to register pursuant to SORNA and received a sentence of two to seven years of incarceration. *Id.* at 80-82.

---

under the age of 16 to whom the person is not married, provided that person is at least four years older than complainant).

[3] Prior to his incarceration, Father was indicated as a perpetrator of abuse by commission against J.L.J. due to an incident in 2008. N.T., 12/14/2018, at 41. According to the Child Protective Services investigation report, when J.L.J. was three months old, his ribs were fractured. Agency Exhibit 7. Father was one of the people living in the home at the time who was responsible for caring for J.L.J. *Id.* Father denied knowing how the injury occurred. *Id.* Father was also indicated as a perpetrator of abuse by omission in 2002 against his former girlfriend's child, who is not involved in this appeal. *Id.*

[4] 42 Pa.C.S. §§ 9799.10–9799.42.

Meanwhile, Snyder County Children and Youth Services (CYS) became involved with Mother due to her substance abuse and poor parenting. *Id.* at 11. CYS implemented a safety plan, which Mother violated, and Children entered foster care in May 2017. *Id.* It is not clear from the record when Children were adjudicated dependent.

Father remained incarcerated throughout Children's dependency. *Id.* at 76, 85. On July 19, 2017, our Supreme Court decided **Commonwealth v. Muniz**, 164 A.3d 1189 (Pa. 2017), in which it concluded that the retroactive application of SORNA's registration requirements violated the *ex post facto* clauses of the United States and Pennsylvania Constitutions. Father received a letter from the Pennsylvania State Police in January 2018 confirming that he would no longer need to register under SORNA. N.T., 12/14/2018, at 85-87; Father's Exhibit 1. Father filed a petition pursuant to the Post Conviction Relief Act (PCRA)[5] challenging his ongoing incarceration on that basis. N.T., 12/14/2018, at 79. Significantly, while Father completed his minimum sentence in July 2016, he remained ineligible for parole because of his refusal to complete a sexual offender class. *Id.* at 76-77. Father refused to complete the class because he maintains he is not a sexual offender. *Id.* at 77.

On April 19, 2018, CYS filed petitions to terminate involuntarily Father's parental rights to Children. CYS filed amended petitions on July 2, 2018,

---

[5] 42 Pa.C.S. §§ 9541-9546.

adding an additional ground for termination. The orphans' court held a hearing on December 14, 2018.[6] At the start of the hearing, the court, which was apparently also handling Father's criminal case, announced that it planned to deny his PCRA petition because he failed to file it within 60 days of the **Muniz** decision, rendering it untimely filed under that statute. **Id.** at 4. The court and the parties then proceeded with testimony regarding the termination petitions. Ultimately, the court dictated an order terminating involuntarily Father's parental rights. The court entered one copy of its dictated order for each of Children on December 19, 2018. Father timely filed a notice of appeal[7]

---

[6] At the time of the hearing, Children were ages 10, 6, and 5. The orphans' court appointed a single attorney to represent Children as legal counsel during the hearing. Counsel informed the court that the preferred outcome of all three Children was adoption. N.T., 12/14/2018, at 102, 106. In addition, at counsel's request, the parties stipulated that Children's foster parents would state, if called to testify, that Children preferred adoption. **Id.** at 102-03. Counsel filed a brief arguing in support of termination on appeal.

[7] By filing a single notice of appeal from the orders terminating his parental rights to Children, Father violated our Rules of Appellate Procedure. **See** Pa.R.A.P. 341, Note ("Where ... one or more orders resolves issues arising on more than one docket or relating to more than one judgment, separate notices of appeal must be filed."); **Commonwealth v. Walker**, 185 A.3d 969, 977 (Pa. 2018) (holding that the failure to file separate notices of appeal from an order resolving issues on more than one docket "requires the appellate court to quash the appeal"). In a recent case, a panel of this Court declined to quash an involuntary termination appeal based on noncompliance with Rule 341, recognizing the possibility that "decisional law may have been unclear to this point[.]" **In the Matter of: M.P.**, 204 A.3d 976, 981 (Pa. Super. 2019). However, the panel announced that this Court would quash all noncompliant appeals filed after the date of its decision on February 22, 2019. **Id.** at 986. Because Father filed his notice of appeal in advance of our Court's decision in **M.P.**, we likewise decline to quash the instant appeal.

- 4 -

on January 7, 2019, along with a concise statement of errors complained of on appeal.

Father now raises the following claim for our review.

I. Whether the [orphans'] court erred and/or abused its discretion by entering an order on December 1[9], 2018 involuntarily terminating the parental rights of [Father], where [Father] has maintained substantial contact with [Children] while incarcerated and where [Father] remains incarcerated even after the case of *Commonwealth v. Muniz* reversed [Father's] registration status and [Father] is incarcerated for failing to change his address for [SORNA]?

Father's Brief at 6.

We review Father's claim in accordance with the following standard of review.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Section 2511 of the Adoption Act governs involuntary termination of parental rights. *See* 23 Pa.C.S. § 2511. It requires a bifurcated analysis:

- 5 -

…. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [subs]ection 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [subs]ection 2511(b)[.]

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the orphans' court terminated Father's parental rights to Children pursuant to subsections 2511(a)(1), (2), (5), (8), and (b). We need only agree with the court as to any one subsection of Section 2511(a), as well as subsection 2511(b), to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we analyze the court's decision pursuant to subsections 2511(a)(2) and (b), which provide as follows.

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

***

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

***

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the

- 6 -

control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

\*\*\*

23 Pa.C.S. § 2511(a)(2), (b).

We begin by assessing whether the orphans' court committed an abuse of discretion by terminating Father's parental rights to Children pursuant to subsection 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted). Importantly, "a parent's incarceration is relevant to the [subsection 2511](a)(2) analysis and, depending on the circumstances of the case, it may be dispositive of a parent's ability to provide the 'essential parental care, control or subsistence' that the [sub]section contemplates." *In re A.D.*, 93 A.3d 888, 897 (Pa. Super. 2014) (citation omitted).

At the conclusion of the termination hearing, the orphans' court placed its findings of fact on the record. Relevantly, the court found that Father was incapable of parenting Children and that he could not or would not remedy his parental incapacity pursuant to subsection 2511(a)(2). N.T., 12/14/2018, at 116. The court emphasized that Father had refused to complete the sexual offender class necessary for him to obtain parole and parent Children. *Id.* The court expressed frustration with this decision, as follows.

> You are a sexual offender. You're convicted of a [f]elony sex offense, that makes you a sexual offender. You could have been paroled possibly two years ago and been involved in [C]hildren's [lives] but because of some ego -- I can't even wrap my arms around it to comprehend the fact that you choose to remove yourself from not just society but from [C]hildren's lives because you won't say what you are, a sex offender. I don't care whether you have to register or not, you're convicted of a [f]elony sex offense, that makes you a sexual offender. And the State is not going to parole you or consider you until you complete [its] classes on a [*sic*] sexual offender. So what you have done is voluntarily made a decision that you don't want to say that you're a sexual offender, which you are, and you have voluntarily removed yourself from [C]hildren's lives for at least two years, and now you're going to continue that for another year-and-a-half that you're going to choose to remain in prison unable to parent [C]hildren for seven years. Your choice. Because you can't parent from prison and even though I understand you're testifying that you want to be involved, you want to parent, your choices don't indicate that….

*Id.* at 113-14.

Father argues that the orphans' court erred and/or committed an abuse of its discretion based upon his claims that he maintained substantial contact with Children during his incarceration, and his incarceration was unconstitutional pursuant to *Muniz*. Father's Brief at 11. Father contends

that he sent letters and called Children on the phone during his incarceration, and that he enjoyed visits with J.L.J. at the prison approximately monthly. *Id.* at 12-13. Father also emphasizes that he was incarcerated for failing to register under SORNA. *Id.* at 14. However, Father observes, the *Muniz* decision provides that he should never have been required to register in the first place. *Id.* He acknowledges that he has completed his minimum sentence and that he would be eligible for parole if not for the fact that he refuses to complete a sexual offender class. *Id.* at 14-15. Father insists that "he is unable to complete his sexual offender class because part of that requirement is [that he] admit he is a sexual offender. Which due to his relationship with [Mother], [he] is not able to do." *Id.* at 15 (citation to the record omitted).

The record supports the findings of the orphans' court. Father has a lengthy history of incarceration. He has been incarcerated on three occasions since J.L.J.'s birth in June 2008, and remained incarcerated at the time of the termination hearing. N.T., 12/14/2018, at 76, 80-85. As Father conceded during the hearing, he is not able to be paroled because he refuses to complete a sexual offender class, which eliminates any possibility of his being released until his maximum sentence expires in July 2021. *Id.* at 76-77, 99. Even if Father is correct that he should be entitled to relief in his criminal case pursuant to *Muniz*, this does not change the fact that imprisonment will

render him incapable of parenting Children for the foreseeable future.[8]  Thus, it was within the court's discretion to conclude that Father's incarceration is a dispositive factor warranting termination of his parental rights.  ***A.D.***, 93 A.3d at 897.  As this Court has emphasized, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities.  The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future."  ***In re Adoption of R.J.S.***, 901 A.2d 502, 513 (Pa. Super. 2006).

We consider next whether the orphans' court abused its discretion by terminating Father's parental rights pursuant to subsection 2511(b).  Father waived any challenge regarding subsection 2511(b) by failing to include it in his concise statement and statement of questions involved, and by failing to develop it in his brief.  ***See In re M.Z.T.M.W.***, 163 A.3d 462, 465-66 (Pa. Super. 2017) ("It is well-settled that this Court will not review a claim unless it is developed in the argument section of an appellant's brief, and supported by citations to relevant authority.… Further, it is well-settled that issues not included in an appellant's statement of questions involved and concise statement of errors complained of on appeal are waived.").  While Father asserts on appeal that he maintained substantial contact with Children during

---

[8] Even when Father has not been incarcerated, his actions have demonstrated that he lacks the capacity to provide parental care.  Most troublingly, Father has been indicated as a perpetrator of child abuse on two occasions, in 2002 and 2008.  N.T., 12/14/2018, at 41.

his incarceration, he does not discuss subsection 2511(b) specifically, nor does he argue that terminating his parental rights would be contrary to Children's needs and welfare.

However, even if Father had preserved a challenge regarding subsection 2511(b) for our review, it would be meritless. The requisite analysis is as follows.

> S[ubs]ection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, [subs]ection 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)).

The orphans' court found that terminating Father's parental rights would best serve Children's needs and welfare pursuant to subsection 2511(b),

reasoning that "[h]is daughters do not even know him and his son who knows him doesn't want any contact with him." N.T., 12/14/2018, at 111-12, 118. The court further found that Children are doing well in their respective pre-adoptive foster homes[9] and that termination of Father's parental rights would cause them little if any harm. *Id.* at 114-15, 118. To the contrary, the court concluded that Children would suffer harm if their adoptions did not proceed. *Id.* at 115, 118.

The record provides overwhelming support for these findings. At the time of Father's incarceration in July 2014, J.L.J. was six years old, while M.D.S. was about a year and a half old, and K.E.S. was seven months old. CYS caseworker Kimberly Shemory testified that Children lived primarily with Mother prior to Father's incarceration and that Father "was in and out. … There were times when [Father] was in the home. There were times that he was not in the home." *Id.* at 36. Father testified that he saw Children only "three or four times" while they remained in Mother's care following his incarceration. *Id.* at 98. Moreover, while Father sent letters to Children and called them on the phone an unspecified number of times after they entered foster care, he visited with J.L.J. only. *Id.* at 20-24. He has not visited with M.D.S. or K.E.S. at all since they entered foster care. *Id.* at 47-48.

Not surprisingly, the record confirms that Children have little if any relationship with Father. Ms. Shemory testified that Father sends four or five

---

[9] J.L.J. is placed in one pre-adoptive foster home while M.D.S. and K.E.S. are placed in another. N.T., 12/14/2018, at 26-29.

letters to J.L.J. per month. *Id.* at 22. However, J.L.J. has chosen to read only one of the letters in the last six months. *Id.* While Father visited with J.L.J. in prison, the visits ended in July 2018 because they were harmful to J.L.J.[10] *Id.* at 20-21. Psychologist Robert Meacham testified that he conducted a bonding evaluation of J.L.J. and Father in October 2018. *Id.* at 63. During the evaluation, J.L.J. was reluctant to speak to Father and Mr. Meacham "really had to prompt him to talk at all." *Id.* at 65-66. Mr. Meacham added, "[h]e's told me consistently he doesn't want to visit, he doesn't want to see him, and he doesn't want to reside with him, and his reluctance I think was reflective of that." *Id.* at 66.

Regarding M.D.S. and K.E.S., Ms. Shemory testified that Father sends them approximately two to four letters per month, but that they are unable to read the letters and that their "comprehension of that is very limited." *Id.* at 23. She reported that K.E.S. did not understand that Father was her parent when she entered foster care. *Id.* at 36. While M.D.S. did understand that Father was her parent, "[s]he does not talk or ask or relay anything about him." *Id.*

In contrast, the record indicates that all three Children share a bond with their pre-adoptive foster parents. Ms. Shemory testified that J.L.J. moved to a new foster home earlier that month, but that he had been visiting since May 2018, and that he is "very vocal that that is where he wants to be.

---

[10] Ms. Shemory explained that J.L.J. "was exhibiting a lot of behavioral issues and emotional distress after visits[.]" N.T., 12/14/2018, at 21.

He is happy, he is secure." *Id.* at 29. Mr. Meacham noted that J.L.J.'s foster parents had previously fostered another boy, who is doing "marvelously," and that they are very capable of meeting J.L.J.'s needs. *Id.* at 68-69. He opined that "we would be placing [J.L.J.] at a significant emotional and developmental risk if that placement was disturbed." *Id.* at 69.

As for M.D.S. and K.E.S., Ms. Shemory testified that their foster parents are loving and nurturing, and that M.D.S. and K.E.S. refer to them as "mom and dad." *Id.* at 26, 28. She reported that M.D.S. "upon seeing me will cross her arms over her chest and demand for me to give her a last name just like her mommy's, which is [her foster mother]." *Id.* at 28. While Mr. Meacham did not conduct a bonding evaluation of M.D.S. and K.E.S. with Father, he testified that he has had contact with M.D.S., K.E.S., and their foster parents. *Id.* at 69. He believed that M.D.S. and K.E.S. view their foster parents as their parents, that their placement has worked out well, and that "to disrupt that placement would be very detrimental to the girls." *Id.* He further opined that he had "seen no indication in any of the three children that separation from the biological parents would cause them any harm at all." *Id.* at 70.

Based on the foregoing, we conclude that the orphans' court did not commit an error of law or abuse of discretion by terminating Father's parental rights involuntarily pursuant to subsections 2511(a)(2) and (b). We therefore affirm the court's December 19, 2018 orders.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>8/19/2019</u>